IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| ANTWON PARKER | § | |
|---|---|---|
| v. | § | CIVIL ACTION NO. 6:10cv296 |
| DAVID FORTNER, ET AL. | § | |

### MEMORANDUM ADOPTING REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE AND ENTERING FINAL JUDGMENT

The Plaintiff Antwon Parker, proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. This Court ordered that the matter be referred to the United States Magistrate Judge pursuant to 28 U.S.C. §636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges. As Defendants, Parker named Powledge Unit physicians assistants named David Fortner and Kerry Scruggs, medical administrator Jeanie Allison, Dr. Hanley, Captain Cecil Hasty, classification chief Amy Jones, Captain Patrick Cooper, Warden Neal Webb, and Warden Michael Sizemore. Of these Defendants, Allison, Jones, Cooper, Webb, and Sizemore have been dismissed, leaving Fortner, Scruggs, Hasty, and Dr. Hanley.

The Magistrate Judge conducted an evidentiary hearing on December 10, 2010. At this hearing and in his complaint, Parker said that in November of 2006, he was injured playing basketball when he fell and another inmate fell on his knee. X-rays taken several months later showed arthritis. Parker was given restrictions and light duty, and was transferred to the Powledge Unit.

Parker arrived at the Powledge Unit in mid-2007 and talked to Fortner about his knee. Although Parker said that his knee continued to hurt, Fortner changed his restrictions to make him an "all-day worker." Parker complained about his kneecap slipping and filed grievances asking for

1

a job change, but to no avail. Parker said that at one point, a nurse emailed Fortner about Parker's complaints; this nurse told Parker that Fortner had said that "there is no cure for constant pain."

Parker was ultimately assigned to work in the kitchen. He filed a complaint with Jeanie Allison, whom he describes as the "complaint coordinator," and was scheduled to see Fortner on June 3, 2009. At this time, he told Fortner that he was having problems with his knee and the restrictions he had, which were limited standing and no squatting, were "not working." He asked for a knee brace and a four-hour work restriction, but Fortner said that TDCJ did not give knee braces any more and that Parker was not old enough to warrant a four-hour work restriction. Parker also said that his medications (Naproxen) were not effective, but Fortner told him to continue taking them. When Parker said that he would go over Fortner's head to get proper restrictions, Fortner put him out of the office, saying that Parker had "threatened" him.

Parker filed another complaint and met with Allison on June 15, 2009. Allison said that Fortner is the health care provider and that Parker is "younger than some of the others."

Parker stated that Captain Hasty changed his job to the split shift as a counter attendant. When Parker asked the reason for this change, Hasty said that Parker was not a four hour worker or in school, and that he needed Parker's job for someone that was. Parker asked why it was just becoming an issue after a year of work, and pointed out that the white inmate now filling his old job was not in school or a four-hour worker. Parker also complained that the counter attendant job was against his work restrictions, but Hasty said "you'll be OK, you can do it."

Parker filed a grievance against Hasty complaining that the officer was ignoring his restrictions and giving job assignments based on race. After this grievance was filed, Hasty changed the job assignments of white inmates who were not four-hour workers to the split shift, but then after the grievance investigation was concluded, he changed them back. Parker asserts that Hasty retaliated against him by changing Parker's job so as to put him in demanding work conditions.

Next, Parker says that he complained to the building lieutenant, Moore, who talked to Chief of Classification Amy Jones on Parker's behalf. Moore also gave Jones an I-60 inmate

request form from Parker asking for a job change. However, Jones refused to change his job or to discuss the problem, and apparently told Parker that his job assignment was within his restrictions.

Parker then spoke to the building captain, Patrick Cooper, about the problem. Cooper talked to Jones and Hasty, and told Parker that Jones would not change his job because he was not being worked outside of his restrictions. Cooper said that he did not think that anything was wrong with Parker's knee and that it was up to Hasty if he wanted to allow Parker a job change to work somewhere else.

In August of 2009, Parker says that he saw Dr. Hanley, an orthopedic surgeon, by video teleconference. He says that Dr. Hanley gave him a "rush evaluation" and simply ordered the same Naproxen medication which had not worked, recommended exercises which only agitated his knee, and delayed access to a knee brace by referring him for an appointment in December.

Meanwhile, Parker says that he received another job change, to the kitchen pot room where the floor was always wet. His knee was agitated by the constant walking back and forth. Hasty refused to give him a job change and Fortner would not change his restrictions.

On September 24, 2009, Parker stated that he was at work when his knee caught a sharp pain. He stopped to catch himself and his left foot came out from under him. He tried to keep from falling but his head hit the floor and he felt a blow to his face. The next thing he knew, a nurse was standing over him. He was taken to the medical department and seen by Fortner, who tried to force his neck to turn despite Parker's pleas not to do that. Although Parker could hardly stand or walk, Fortner told the nurse to give him an ice pack and a cell pass for the rest of the day and to not schedule any X-rays.

The next day, Parker stated that he could barely move. He was seen by a nurse on September 26, and she said that Fortner's notes said that there was nothing wrong and no injuries. She would not give him a cell pass because Fortner did not think that he needed one for more than the one day. Parker saw another nurse on September 29 and she also said that she could do nothing

because of Fortner's notes, but that she would try to get Scruggs, another physicians assistant, to see him.

Parker states that he saw Scruggs on September 30, 2009. He says that she "intentionally saw other inmates before him," which forced him to sit and wait on a bench for over five hours. When she finally called him out, she saw him under Fortner's supervision. Scruggs gave him a "1 finger touch exam" and said that he was suffering from back spasms. She told him that he needed to try turning his head to work the muscles loose, and ordered high blood pressure medication for him, as well as medicine for the spasms. The nurse asked if Parker was to get a cell pass, and before Scruggs could answer, Fortner cut her off and said "no, he can go back to work, he's not in that much pain." Parker said that he could not work in his condition, but Fortner replied "that's between you and the officers." He was sent away with no cell pass and nothing to support his neck.

On October 5, 2009, Parker stated that he saw Warden Sizemore, who told him that he was aware of the accident in the kitchen and assured him that some changes would be made, but nothing was done. On October 7, he saw a PA named Smock by video teleconference, and she changed his medications and gave him a three-day cell pass.

One week later, on October 14, 2009, Parker again saw Allison, asking her why he was not being given proper medication or being taken seriously. She told him that Fortner is convinced that nothing was wrong with him but that "he could be wrong, we all make mistakes." Allison said that Parker could not have injured himself in a simple slip and fall, even though Parker said that he had been told that he pulled a lot of cooking pans on himself when he fell and that he hit his head on the concrete floor. Allison replied that she would have to see what Fortner wanted to do. Parker saw Smock again on October 29, and she changed his medications back to Naproxen and ordered X-rays. He still received nothing to support his neck.

During this time, Parker states that he had been receiving disciplinary cases because he was physically unable to work. On October 21, 2009, he was served with a major case. Captain

Cooper presided over the hearing and would not let him call witnesses, saying that if there was no one who could say that he was really hurt, there is no need to call anyone. Cooper would not let Parker read his statement and would not accept evidence in Parker's favor, and lied by saying that the computer had graded the case as major "so it could not be overturned anyway."

The next day, Parker went to a UCC hearing with Warden Webb, Amy Jones, and Major Donna Kazmierczak. He explained his problems, but Jones told Webb that Hasty was not working Parker outside of his restrictions. Jones and Kazmierczak agreed that Parker could be faking his injuries, and Jones said that Fortner had stated that his work restrictions did not prevent him from working any job in the kitchen. After hearing all this, Webb said that he would not "reward" Parker for not working by giving him a job change.

On October 24, 2009, Parker said that the medical department would not see him for his complaints of neck pain. He states that they will not give him support for his neck and refuse to run any tests other than an X-ray. He speculated that Captain Hasty told people that he was faking his injury. Parker signed his lawsuit on May 29, 2010.

Following the evidentiary hearing, the Magistrate Judge issued a Report recommending that the claims against the defendants Allison, Jones, Cooper, Webb, and Sizemore be dismissed as frivolous and for failure to state a claim upon which relief may be granted. The Magistrate Judge also ordered that the remaining defendants, Fortner, Scruggs, Dr. Hanley, and Captain Hasty, answer the lawsuit. This Report was adopted, over Parker's objections, on February 1, 2011. Parker filed a notice of appeal, but this was dismissed for want of jurisdiction.

The remaining defendants in the case filed a motion for summary judgment, to which Parker filed a response. On January 19, 2012, the Magistrate Judge issued a lengthy and detailed Report recommending that the motion for summary judgment be granted and that the lawsuit be dismissed. Parker has filed objections to this Report.

In this Report, the Magistrate Judge identified four claims which Parker was raising: (1) deliberate indifference to his serious medical needs, (2) deliberate indifference to his health and

safety through his job assignment, (3) retaliation, and (4) discrimination. In discussing the first of these, the Magistrate Judge detailed the contents of Parker's medical records, noting that these records show that Parker was seen and treated on numerous occasions, including various different medications, X-rays, hot packs, cold packs, recommendations for exercise, steroid injections, and a referral to an orthopedic specialist, Dr. Hanley. The Magistrate Judge also reviewed Parker's summary judgment evidence, including Parker's affidavit as well as exhibits.

The Magistrate Judge concluded that Parker had received a "substantial quantum" of medical care, and that Parker's disagreement and dissatisfaction with the treatment he had received, and his complaint that he had been mis-diagnosed, did not show that he had been the victim of deliberate indifference to his serious medical needs. The Magistrate Judge thus determined that Parker's first claim for relief lacked merit.

With regard to the claim of deliberate indifference surrounding Parker's job assignment, the Magistrate Judge noted that Parker claimed that he was supposed to be allowed to take a ten-minute break every hour, pointing to a hand-written note from Allison. However, the Magistrate Judge observed that Parker's health summary for classification form, which is the form completed by the medical department informing the classification department of an inmate's work restrictions, contained no mention of a requirement of resting for 10 minutes every hour.

The Magistrate Judge stated that although Parker complained that he was unable to perform the job assignments given to him, repeated examinations by the medical department did not find any physical reason why he should not be able to do so. The medical staff placed work restrictions of limited standing and no squatting, and the classification department determined that the jobs given to Parker were consistent with these restrictions. The Magistrate Judge stated that Parker's disagreement with the classification department's determination does not show deliberate indifference.

The Magistrate Judge looked to the district court's decision in <u>Everett v. Jones</u>, civil action no. 6:08cv240, 2009 WL 1269585 (E.D.Tex., May 7, 2009, no appeal taken). In that case,

an inmate named Wesley Everett was incarcerated at the Powledge Unit between 2006 and 2008. He worked various jobs in the kitchen, including a counter attendant, and had a restriction of "limited standing." Like Parker, Everett had a note from Jeanie Allison saying that limited standing meant that he should be assigned to work where he could elevate his lower extremities for 10 minutes every hour. An investigation concluded that the job assignment was not incompatible with this restriction, and the district court concluded that the prison officials had no duty to believe Everett's assertion that he was assigned outside of his medical restrictions when an investigation had determined that he was not. The district court also determined that Everett did not show that his job assignment amounted to "cruel or unusual punishment." *See also* Harper v. Tran, 77 F.3d 478, 1996 WL 46726 (5th Cir., January 8, 1996) (assignment of inmate with degenerative disc disease to work as an orderly, including such tasks as climbing stairs to deliver food, mopping and sweeping floors, and transporting barrels of wet laundry, which the inmate said resulted in "limited range of motion and excruciating recurring pain," did not set out a claim under 42 U.S.C. §1983).

In the present case, the Magistrate Judge said, Captain Hasty was entitled to rely on the information put out by the medical department and the classification department, both of which said that Parker was able to work in the kitchen at the jobs assigned to him. Hasty also had no constitutional to accept Parker's assertion that he could not work as a counter attendant or a floor server in the face of contrary statements from the classification department and the medical department.

In addition, the Magistrate Judge stated that Parker failed to show that the work assigned to him significantly aggravated a serious medical condition. On September 30, 2009, six days after he fell in the kitchen, his medical records showed that he had slight pain in his back and neck and could walk without significant limitations. On October 7, 2009, he was examined by a nurse practitioner Smock, who noted that he could touch his chin to his chest and was able to remove his shirt "easily." Lumbar and cervical X-rays taken in October of 2009 were normal, and an examination by Smock on October 21 revealed full range of motion in Parker's arms and full

7

forward flexion in his knack, although he said that he could not tilt his head backwards without pain. An examination in November of 2009 at the Dalhart Unit showed some tenderness to the back muscles, but no tenderness directly over the spine and a normal gait. Another examination nine days later revealed a normal gait and that Parker could sit erect with no signs of discomfort.

Parker's third claim was that Captain Hasty discriminated against him through job assignments. He said that he was told that his job was needed for a four-hour worker or someone in school, but the job was given to a white inmate who was not a four-hour worker or in school. Parker also said that after he filed a grievance, Hasty changed the job assignments of white inmates who were not four-hour workers to the split shift, but after the grievance was investigated, Hasty changed them back.

The Magistrate Judge concluded that these allegations did not show that Parker was the victim of racial discrimination. The fact that a white inmate got Parker's old job does not itself show discriminatory purpose, and vague and conclusory allegations of discrimination are not sufficient to raise an equal protection claim. The evidence showed that inmates were routinely moved around to different jobs, and Parker has failed to show discriminatory intent.

Parker similarly claimed that he was the victim of discrimination as a "class of one." In order to prevail on a "class of one" theory," Parker must show that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. The Magistrate Judge concluded that Parker's conclusory assertions were insufficient to support a "class of one" discrimination claim.

Finally, Parker complains that he was the victim of retaliation by Fortner and Hasty. With regard to Fortner, the Magistrate Judge determined that Parker failed to show that but for the grievances which he filed, the medical treatment which he received would have been different. As noted above, the medical records show that Parker was repeatedly seen and treated by medical personnel. Medication was prescribed, tests were done, diagnoses were made, and Parker was referred to an orthopedic specialist. The fact that Parker may have disagreed with the treatments and

the diagnoses, and was dissatisfied with the referral to Dr. Hanley, does not make these actions into a retaliatory adverse act nor does it show that but for any alleged retaliatory intent, the medical treatment which he received would have been different. As the Magistrate Judge noted, the summary judgment evidence includes an affidavit from Dr. Steven Bowers, which opined that the restrictions and medical care provided to Parker were appropriate and performed within the standard of care.

Similarly, the Magistrate Judge said, Parker did not set out a viable claim of retaliation against Captain Hasty because the information available to Hasty showed that Parker was medically classified is able to work in the kitchen. The Magistrate Judge thus concluded that Parker did not show that but for the alleged retaliatory intent, his job assignments would have been different. The Magistrate Judge also determined that the Defendants were entitled to the defense of qualified immunity.

In his objections, Parker first says that his affidavits "squarely contradict" the Defendants' assertions concerning his medical care. He points to a number of instances in which he disagrees with the conclusions of the medical personnel and complains that he was not X-rayed for six months and that he was never given anything to limit the pressure put on his knee. He says that his affidavits and testimony show that he was never treated for his knee condition with anything other than "pain medications which did not work." Although Parker contends that his affidavits create a genuine issue of material fact, these affidavits simply highlight Parker's disagreements with the treatment that he received. As the Magistrate Judge pointed out, the fact that the medical care provided was not necessarily "the best that money could buy" does not show deliberate indifference. Mayweather v. Foti, 958 F.2d 91, 91 (5th Cir. 1992); see Domino v. TDCJ-ID, 239 F.3d 752, 756 (5th Cir. 2001).

Parker argues that evidence that the medical staff treated him as a "nuisance" and were insufficiently interested in his health to take even minimal steps to ensure that his injury was not severe could support a finding of deliberate indifference, but the medical records show that Parker was routinely seen and treated by a number of medical providers. Parker's disagreement with

the assessments of him and the treatment provided simply does not show that the medical providers were deliberately indifferent to his serious medical needs. His objection on this point is without merit.

Next, Parker says that he has "newly discovered evidence" regarding his claim of deliberate indifference in his job assignment. This "newly discovered evidence" consists of supplemental disclosures by the defendants, including a guideline for the completion of the health summary for classification forms; this guideline shows that the restriction "limited standing" means, as the note from Allison said, that the inmate should be assigned to work where he may elevate his lower extremities for 10 minutes every hour.

While Parker argues that this proves that Hasty knew that he was being worked against his medical restrictions, the Magistrate Judge correctly observed that repeated investigations into Parker's complaints invariably concluded that Parker was not being worked against his medical restrictions. Even if the guidelines for completing the health summary for classification form show that Hasty should have been aware of the problem, a dubious assumption in light of the fact that the medical department, the classification department, and the grievance investigators all concluded that Parker was properly assigned, the Supreme Court has explained that "an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979 (1994).

Parker argues that "willful ignorance" or "purposely avoiding knowledge" can amount to deliberate indifference, pointing to the Seventh Circuit decision of Mayoral v. Sheahan, 245 F.3d 934 (7th Cir. 2001). In that case, a jailer in the Cook County Jail testified that she was not aware of gang activity in the jail, despite the fact that gangs were pervasive at the jail, with approximately 80 percent of the inmates being gang-affiliated. The Seventh Circuit held that this testimony was "incredible" and explained that the Farmer standard is "not designed to give officials the motivation to 'take refuge' in the zone between ignorance and actual knowledge." In the present case, by

contrast, Parker has not shown that Captain Hasty was willfully ignorant or intentionally oblivious, as the jailer in Mayoral appeared to be. On the contrary, his view that Parker's job assignment comported with his medical classification was consistent with the opinion of the medical department, the classification department, and the grievance investigators. Parker has not shown that Captain Hasty was deliberately indifferent to his safety by assigning Parker to jobs which the medical department and the classification department said that he could hold.

Instead, Parker argues that Fortner and Jones, the classification chief, were deliberately indifferent to his safety by determining that he could do kitchen work. He says that he repeatedly complained to Fortner that the limited standing restriction did no good because when his knee hurt, it hurt for hours at a time, and not minutes. He also says that he told Fortner that his job assignment would not allow him to sit, but that Fortner made no effort to consider other restrictions, such as a four-hour work requirement. Similarly, Parker says that Jones assigned him to work in the kitchen even though he was not allowed to sit for any length of time, although he concedes that it would not have mattered had he been allowed to sit. In effect, Parker is disagreeing with Fortner's determination that he was medically able to work in the kitchen, and with Jones' decision to assign him to the kitchen based on the determination from the medical department that he could work there. This disagreement does not show that Fortner or Jones were deliberately indifferent to his safety. His objection on this point is without merit.

The Magistrate Judge determined that Parker had failed to show that the work assignment significantly aggravated a serious medical condition. Parker objects to this conclusion, noting that he had testified that on September 24, 2009, he was at work when his knee caught a sharp pain, and his foot came out from under him, causing him to fall. An examination showed that he had full range of motion and Fortner determined that he had no injuries, which Parker disputes. An examination on September 30 revealed slight pain with palpation of the muscles next to the spine in the shoulder, and slight pain in the trapezius muscle. At this examination, the medical records

show that Parker say and walked without significant limitations. Parker also disagrees with the September 30 assessment.

In his objections, Parker argues that the sharp pain in his knee which caused him to fall is evidence that his job assignment significantly aggravated his medical condition. The medical records show that Parker claimed to suffer a sharp pain in his knee which caused him to fall, but that this fall did not cause him to suffer any significant injuries. Thus, he has not shown a significant aggravation of his medical condition. Furthermore, Parker has not shown that the assignment of kitchen work was done with the knowledge that this assignment would significantly aggravate his medical condition. *See* Mendoza v. Lynaugh, 989 F.2d 191, 194 (5th Cir. 1993). On the contrary, the medical staff determined that Parker was able to work in the kitchen, and so neither Jones nor Hasty could have known that an assignment there would significantly aggravate his medical condition. Parker's objections in this regard are without merit.

Next, Parker says that the fact that Hasty lied about the reason for changing Parker's job is itself proof of discrimination. After he pointed out to Hasty that the white inmate who got his job was neither in school nor a four-hour worker, Parker says that Hasty refused to comment on the issue. Because Hasty had "no rational basis" for the job change, Parker says that this is proof of discrimination. He cites the Seventh Circuit decision of Williams v. Lane, 851 F.2d 867 (7th Cir. 1988), in which the court held that disparate treatment of inmates in protective custody with regard to access to court, religious freedom, and freedom from cruel and unusual punishment could implicate the Equal Protection Clause. The defendants had argued that the disparate treatment was justified by security concerns, but the district court and the Seventh Circuit concluded that the true reason was the prison's lack of desire to make improvements.

Parker's objection on this point lacks merit because unlike the rights claimed to be infringed in Williams, he has no constitutional right to a particular prison job. *See* Bulger v. United States Bureau of Prisons, 65 F.3d 48, 49-50 (5th Cir. 1995). As the Magistrate Judge said, the mere fact that Parker's old job was filled by a white inmate is not proof of racial discrimination; instead,

the prisoner must show that the prison official acted with discriminatory animus, and an equal protection claim must be based on more than a mere personal belief that the prisoner was the victim of discrimination, or vague and conclusory allegations of discrimination.[1]

      The Magistrate Judge stated in a footnote that although Parker sought additional discovery, he did not show how such discovery would defeat the summary judgment motion, but simply offered vague assertions that the additional discovery would offer needed but unspecified facts. Parker objects to this statement, saying that his requests for discovery have been denied; he says that he specifically showed that the kitchen job change roster was a "fake" and that other documents were altered in some unspecified way to support the defendants' version of events. The job change roster and other documents were filed by Parker along with his objections; it shows his assignments as a kitchen helper, janitor, the utility squad, a counter attendant, and a stock clerk in the kitchen. This appears to comport with Parker's own testimony that he was assigned to work in the kitchen as a counter attendant. The Magistrate Judge twice granted motions by Parker to compel discovery, and the Court has reviewed the documents produced by Parker along with his objections. None of these documents show any reason to set aside the Report of the Magistrate Judge, and Parker has not shown that additional disclosure was warranted, or that such disclosure would have produced facts sufficient to defeat summary judgment. *See* International Shortstop Inc. v. Rally's, Inc., 939 F.2d 1257, 1266-67 (5th Cir. 1991); King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994).

      Parker says that had the lay-in list been preserved, this would have showed that he never had any follow-up visits and that he "never missed any medical visits because they never existed," and that he was "seen in medical and was there all day," which he says would show that the disciplinary cases he received were "bogus." The medical records show the dates that Parker was seen by the medical department, and these records were available to him. Parker also argues that the Defendants offered a statement which was a "counterfeit" of his and that the kitchen job change

---

[1] The law does not and could not require that prison officials must justify all prisoner job changes with a rational basis or face potential discrimination claims.

roster was incomplete because it did not show the fact that he has worked nearly every job in the kitchen except as a cook, baker, or butcher; instead, it merely gives the job titles of "counter attendant" and "kitchen helper." Parker appears to believe that the roster list should be more detailed, listing specific tasks such as working in the pot room, rather than simply listing job titles. He goes on to repeat his complaint about having his job changed and given to a white inmate, and says that a roster listing specific tasks would prove his point. Parker's objection on this point is without merit.

Parker argues that prison officials cannot retaliate against inmates for complaining about prison conditions and says that the "suspicious timing of adverse action," taken shortly after a prisoner had made such complaints, is the type of evidence which will support a retaliation claim. He contends that Hasty retaliated against him by not allowing him to elevate his leg for 10 minutes every hour, but that this is not his only claim of adverse action. Parker adds that unspecified "material documents" have not been disclosed to him which would prove this claim.

With regard to Fortner, Parker says that on May 16, 2009, he filed a complaint with Allison about Fortner refusing to see him and avoiding him, and that shortly after this, Fortner lied to him and denied him a knee brace because of his age, and said that he would advise against any recommended restrictions. The Magistrate Judge stated that Parker had not shown that but for an alleged retaliatory motive, the actions taken of would not have occurred; Parker says that the proof of causation is in the sworn statements of Hasty and Fortner. A review of these statements turns up nothing to show that but for an alleged retaliatory motive, the allegedly adverse actions taken by Hasty and Parker would not have occurred. This objection is without merit.

Parker goes on to list a number of actions which he complains, including forcing him to work against his medical restrictions, forcing him to work in unsafe conditions, filing false disciplinary cases and "restriction of rights for no logical reason," being denied and delayed medical care after complaining of pain, and approving a transfer on a "12 hour bumpy bus ride." He says that

he had never before received a case for refusing to work and had never been bounced from job to job in a two month period as he was after he filed a complaint.

However, the mere fact that grievances were filed and allegedly adverse action was taken later does not show retaliatory intent. In <u>Reese v. Skinner</u>, 322 Fed.Appx. 381, 2009 WL 1066997, the Fifth Circuit held that an allegation that "harassment of him intensified after he started filing grievances" was insufficient to show retaliation; the Fifth Circuit said, citing <u>Strong v. University HealthCare Systems, LLC</u>, 482 F.3d 802, 808 (5th Cir. 2007) that "temporal proximity is insufficient to prove 'but for' causation." This comports with prior Fifth Circuit case law holding that the mere fact that one incident precedes another is not proof of a causal connection; this is the logical fallacy of *post hoc ergo propter hoc* (after this, therefore because of this). <u>Huss v. Gayden</u>, 571 F.3d 442, 459 (5th Cir. 2009) (noting that "the *post hoc ergo propter hoc* fallacy [after this, therefore because of this] assumes causality from temporal sequence," which is a "false inference"); <u>Tampa Times Co. v. National Labor Relations Board</u>, 193 F.2d 582, 583 (5th Cir. 1952) (*post hoc ergo propter hoc* is not sound logic). Parker has failed to show that but for an alleged retaliatory intent, the actions complained of would not have occurred. His objection on this point is without merit.

Finally, Parker challenges the Magistrate Judge's recommendation on qualified immunity, arguing that the defendants are not entitled to immunity because there are disputed facts which must be resolved. The Magistrate Judge correctly determined that Parker failed to discharge his burden of overcoming the qualified immunity defense because he did not show that any constitutional violations were committed, nor that any of the Defendants acted unreasonably in light of clearly established law. *See* <u>Michalik v. Hermann</u>, 422 F.3D 252, 262 (5th Cir. 2005). Parkers objections are without merit.

The Court has conducted a careful *de novo* review of the pleadings in this cause, including the Plaintiff's complaint and testimony, the Defendants' motion for summary judgment, the Plaintiff's response thereto, all other pleadings, documents, and summary judgment evidence in

the case, the Report of the Magistrate Judge, and the Plaintiff's objections thereto. Upon such *de novo* review, the Court has concluded that the Report of the Magistrate Judge is correct and that the Plaintiff's objections are without merit. It is accordingly

ORDERED that the Plaintiff's objections are overruled and the Report of the Magistrate Judge (97) is ADOPTED as the opinion of the District Court. It is further

ORDERED that the Defendants' motion for summary judgment (docket no.'s 57 and 58) is hereby GRANTED and the above-styled civil action be and hereby is DISMISSED with prejudice. It is further

ORDERED that any and all other motions which may be pending in this cause are hereby DENIED.

**So ORDERED and SIGNED this 9th day of March, 2012.**

---
**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**